**LEATHERMAN TOOL GROUP, INC., an Oregon corporation, Plaintiff–Appellee,**

v.

**COOPER INDUSTRIES, INC., an Ohio corporation, Defendant–Appellant.**

**Nos. 98–35147, 98–35415.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 4, 1999

Filed Dec. 17, 1999

John D. Vandenberg, David J. Earp and Garth A. Winn, Klarquist Sparkman Campbell Leigh & Whinston, Portland, Oregon, for the defendant-appellant.

J. Peter Staples, Julianne Ross Davis and Bruce W. DeKock, Chernoff, Vilhauer,

McClung & Stenzel, Portland Oregon, for the plaintiff-appellee.

Before: CANBY, and T.G. NELSON, Circuit Judges, and FOGEL,[1] District Judge.

FOGEL, District Judge:

In this case we must decide when and to what extent the overall appearance of a non-patented product is protectable as "trade dress." Plaintiff Leatherman Tool Group, Inc. ("Leatherman") was first to market with an admittedly ingenious multi-function pocket tool which improves on the classic "Swiss army knife" in a number of respects. Not the least of the improvements was the inclusion of pliers, which, when unfolded, are nearly equivalent to regular full-sized pliers. Leatherman sells its tool under the name "Pocket Survival Tool" ("PST").[2] Leatherman apparently largely created and undisputedly now dominates the market for multi–function pocket tools which generally resemble the PST.

Defendant Cooper Industries, Inc. ("Cooper") owns numerous famous tool industry brand names including "Crescent"; it is best known for the Crescent adjustable wrench which was copied widely by other toolmakers in the early part of the 20th century. There is no dispute that at some point Cooper became aware of the PST and of Leatherman's market dominance and set out to compete in that market. There also is no dispute that at a trade show in 1996, Cooper announced a multi-purpose tool which differed in appearance from the PST in only three respects: 1) the Cooper tool was marked with a different name than the PST, 2) the fasteners which held the Cooper tool together differed from the PST fasteners,

and 3) the Cooper tool included a serrated blade and certain other small but not particularly visible differences. During development, Cooper internally referred to its competing tool as the "Cooperman." When it was announced, Cooper called its tool the Crescent "Toolzall" (hereinafter "the original Toolzall" or "the Toolzall").

After the trade show, Leatherman filed this action and obtained a preliminary injunction prohibiting Cooper from marketing the original Toolzall. Cooper thereafter developed and marketed a version of the Toolzall ("the second Toolzall") which differed more from the PST.

This action then proceeded to trial by jury. The jury found that the overall appearance of the PST was protectable trade dress and that the original Toolzall infringed that trade dress. The jury found that the second Toolzall did *not* infringe the trade dress of the PST. Cooper moved for judgment as a matter of law on Leatherman's trade dress claim, arguing that Leatherman did not prove that "entire design" of the PST was nonfunctional. The district court denied Cooper's motion.

The jury awarded no damages as to the trade dress infringement. Pursuant to the finding of infringement, however, the district court entered a permanent injunction precluding Cooper from marketing the original Toolzall. Cooper therefore has appealed that portion of the judgment.

We conclude that the district court should have granted Cooper's motion for judgment as a matter of law on Leatherman's trade dress claim and therefore we reverse the judgment in part. In an unpublished memorandum filed herewith, we affirm the jury's award of damages on certain other claims and remand for further consideration the question of whether those other claims support an award of

---

1. The Honorable Jeremy Fogel, United States District Judge for the Northern District of California, sitting by designation.

2. Leatherman sells other models of multifunction tools which differ in size and functions. Those tools are not at issue in this litigation.

attorneys' fees absent trade dress infringement.

## I.

■ "The standard of review for the denial of a motion for judgment as a matter of law after a jury trial is the same as the standard of review for reviewing a jury's verdict: 'both the verdict and the denial of the motion must be affirmed if there is substantial evidence to support the verdict.'" *Gilbrook v. City of Westminster,* 177 F.3d 839, 856 (9th Cir.1999) (quoting *Landes Constr. Co. v. Royal Bank of Canada,* 833 F.2d 1365, 1370–71 (9th Cir. 1987)).

## II.

Leatherman claimed, and the jury found, a protectable trade dress in "the overall appearance" of the PST.[3] Leatherman asserts that the protectable appearance includes:

> [T]he combination of multiple features, including: the tool size; the shape of the handles; the shape of the gripping jaws including the selection, shape and placement of the gripping jaw features (needlenose, arcuate gripping surface and cutters); the mirror image of the tool handles; the brushed stainless steel finish on the handles; the selection, arrangement and shape of all of the various tool blades both individually and collectively; the combination and arrangement of all the above features; the proportional sizes of components in relation to each other; and, the type and appearance of the pivot joint on the pliers head.

At first blush it would appear easy to conclude that the jury's finding of trade dress infringement is supported by substantial evidence. Cooper acknowledges it copied the overall appearance of the PST almost exactly. There is no dispute that one must look fairly closely at the products to distinguish them. The fact that Cooper could have chosen to use an appearance which more visibly distinguishes its product from the PST is confirmed by the jury's finding that the second Toolzall did *not* infringe.

■ To uphold a finding of infringement here, however, would suggest that the general appearance of almost *any* unpatented product rarely if ever could be copied faithfully.[4] That is not the law. Rather, "[t]he physical details and design of a product may be protected under the trademark laws only if they are nonfunctional...." *Clamp Manufacturing Co., Inc. v. Enco Manufacturing Co., Inc.,* 870 F.2d 512, 515 (9th Cir.1989) (citing *Vuitton Et Fils S.A. v. J. Young Enterprises,* 644 F.2d 769, 772 (9th Cir.1981)). The *Clamp* court went on to explain:

> The requirement of nonfunctionality is based "on the judicial theory that *there exists a fundamental right to compete through imitation of a competitor's product,* which right can only be *temporarily* denied by the patent or copyright

---

3. Cooper contends it was prejudiced when on the last day of the trial the district court changed the previously agreed-to phrase "entire design" to "overall appearance" in two jury instructions. Cooper appears to understand "entire design" to mean something different from the "overall appearance." Although "design" and "appearance" are not fully synonymous, we have trouble seeing a meaningful distinction in this context. Whether one says "entire design" or "overall appearance" the basic connotation is "what the product looks like, viewed as a whole."

   It appears Cooper may be trying to say that when all of a product's features, including

4. Some cases use the term "slavishly copied." We use the term "faithfully copied" to mean the same thing, i.e., copying to the extent that few if any differences in appearance are readily noticeable, whether or not differences in quality or other differences are discernable on close inspection.

features like size, shape, texture, materials, combinations and placement of elements, etc., are chosen as a matter of *engineering* design in a functional product, then there simply is no non-functional aspect to the "overall appearance" of the product. With this concept we agree, as set forth in more detail below.

laws." *In re Morton–Norwich Products, Inc.,* 671 F.2d 1332, 1336 (C.C.P.A. 1982) (emphasis in original). If the utilitarian aspects of the product are its essence, only patent law protects its configuration from use by competitors. *See Morton–Norwich,* 671 F.2d at 1338–40; *cf. Vuitton,* 644 F.2d at 776–77. "Functional features of a product are *features which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product.*" *Vuitton,* 644 F.2d at 774. For an overall product configuration to be recognized as a trademark, the entire design must be nonfunctional. *Textron, Inc. v. U.S. Int'l Trade Comm'n,* 753 F.2d 1019, 1025 (Fed.Cir. 1985). "[*T*]*he right to copy better working designs would, in due course, be stripped of all meaning if overall functional designs were accorded trademark protection because they included a few arbitrary and nonfunctional features.*" *Id.*

*Id.* at 516 (some internal citations omitted, some emphasis added).[5]

The *Textron* court further explained an important difference between "de facto" and "de jure" functionality:

> In essence, de facto functional means that the design of a product has a function, i.e., a bottle of any design holds fluid. De jure functionality, on the other hand, means that the product is in its particular shape *because it works better in this shape* .... [B]efore an overall product configuration can be recognized as a trademark, the entire design must be arbitrary or non de jure functional.

*Textron, Inc. v. U.S. Int'l Trade Comm'n,* 753 F.2d at 1025 (citations omitted, emphasis added, emphasis in original omitted).

In *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431 (3d Cir.

1994), the court identified additional issues with alleged trade dress lying solely in "product configuration."

> Of course, it is not the purpose of unfair competition law, under the guise of either consumer protection or the protection of business good will, to implement a policy of encouraging innovative designs by protecting them once designed. Those issues are the province of copyright and patent laws. Moreover, design protection laws (which have repeatedly been introduced in Congress during virtually every session since 1917) have not once been enacted. *See Esquire, Inc. v. Ringer,* 591 F.2d 796, 800 n. 12 (D.C.Cir.1978) (observing that since 1914 none of the approximately 70 design protection bills introduced in Congress had passed); Brown, *Design Protection: An Overview,* 34 UCLA L.REV. at 1395 ("Beginning in 1957, a [design protection] bill has been introduced in probably every Congress...."); Dratler, *Trademark Protection for Industrial Designs,* 1988 U.ILL.L.REV. at 888 & n. 4, 904 & n. 94 (stating that the history of the effort to have Congress enact industrial design legislation takes up 160 pages in a Copyright Office bibliography, and that between 1914 and 1945 at least 45 such bills were introduced in Congress).

> .... We believe that courts should exercise restraint so as not to undermine Congress's repeated determinations not to afford virtually perpetual protection to product configurations with an expansive construction of section 43(a). What Congress has, for the great span of this century, been unwilling to do, ... should not be effected by the judiciary.

40 F.3d at 1446–47 (some internal citations and footnote omitted).

---

**5.** The *Clamp* court ultimately upheld the trial court's finding of trade dress infringement, albeit with reluctance. *See* 870 F.2d at 516–17. Nothing in the opinion or in the district

court opinion in that case, *Clamp Mfg v. Enco Mfg.,* 5 U.S.P.Q.2d 1643, 1987 WL 46520 (C.D.Cal.1987), discloses exactly what the nonfunctional features of the product were.

■ Several other courts have noted that it is, and should be, more difficult to claim product configuration trade dress than other forms of trade dress. *See, e.g., Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 379 (2d Cir.1997). ("[T]his circuit appears to be moving toward a rule that packaging is usually indicative of a product's source, while the design or configuration of the product is usually not so."); *Versa Products Company, Inc. v. Bifold Co. (Manufacturing) Ltd.,* 50 F.3d 189, 207–08 (3d Cir.1995) (holding that deliberate intent to copy does *not* support finding a likelihood of confusion in product configuration cases unless a "product's labeling and marketing are also affirmatively misleading").[6]

■ With these standards in mind, it becomes apparent that there is no evidence in the record which supports the jury's conclusion that the overall appearance of the PST is protectable trade dress. To be sure, the PST has an appearance, as every physical object must. There is no evidence, however, that anything about that appearance (other than the Leatherman name) exists for any non-functional purpose. Rather, every physical part of the Leatherman is de jure functional. No witness pointed to any feature of, or marking on, the PST (other than the Leatherman name) which was ornamental or intended to identify its source. Rather, the evidence showed, as in *Textron,* that "the product is in its particular shape *because it works better in this shape.*" 753 F.2d at

1025 (emphasis added). Indeed, the designer of the PST repeatedly testified as to his belief in the truth of Leatherman's claims as to the superiority of the PST design.

Leatherman is correct that trade dress must be viewed as a whole, but where the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate "overall appearance" which is non-functional. If it is permissible to draw a distinction between such an object and its "general appearance," then virtually nothing is utilitarian, and virtually the only product designs which could be copied faithfully are those which are widely used and therefore in the public domain. Such a result would be wholly inconsistent with the principles and authorities discussed above.

Nor can the fact that there are many other multifunction tools with a variety of appearances (including the second Toolzall) preclude Cooper from faithful copying of the PST. While it is appropriate to look to possible alternatives when judging whether a design is functional, the evidence here was unequivocal that none of the alternatives offered the same functionality as the PST. Even though many of the tools likely are highly functional and useful, none of them offer *exactly* the same

---

6. We note that the circuits are split as to whether product configuration cases are different conceptually from ordinary trademark or trade dress cases. *See Ashley Furniture Industries, Inc. v. Sangiacomo N.A. Ltd.,* 187 F.3d 363, 370–73 (4th Cir.1999) (criticizing *Duraco*). The focus of the split, however, is what it takes for a trade dress to be "inherently distinctive" and whether the traditional categories of generic, descriptive, suggestive, arbitrary, and fanciful can be applied meaningfully in product configuration cases. *See id.* Because this case does not present those issues squarely, we do not decide them. We hold only that in a product configuration case there must be some aspect to the configura-

tion which is nonfunctional, a premise with which even the *Ashley Furniture* court would appear to agree. *See id.* at 375–76 (arguing that the requirement of nonfunctionality is sufficient to protect the right to compete). As a practical matter, though, it may often be difficult to show that the configuration of a useful product is not functional. As the issue would be less likely to arise with product packaging, and could not arise with respect to a trademark, it is fair to say that it may be more difficult to establish protectable rights in product configuration cases, even assuming the legal concepts and standards otherwise are no different.

features as the PST. For example, a particular alternative design might be substantially larger than the PST. As such, it might actually be *preferred* by a customer seeking a heavier-duty tool to keep in the car. A customer looking for a tool to carry in a pocket every day, though, might prefer the compactness of the PST.[7] Leatherman does not have the right to preclude competition in any particular subset of the overall market.

Leatherman relies on an unreported district court case, and three cases cited by that case, for the proposition that in analyzing whether there are viable alternative designs, courts should look to "broadly defined product lines." The published cases are *Brandir Int'l, Inc. v. Cascade Pacific Lumber Co.*, 834 F.2d 1142 (2nd Cir.1987); *In re DC Comics, Inc.*, 689 F.2d 1042 (C.C.P.A.1982); and *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327 (2nd Cir.1983).

In *Warner Brothers*, the court rightly rejected an argument that labels on a toy car which allowed children to *identify* it as a "Dukes of Hazzard" car were "functional." *See* 724 F.2d at 330–32. *DC Comics* involved a party's attempt to register drawings of certain comic characters as trademarks for dolls of the same characters. In concluding that registration would not allow a monopoly on dolls in general, the court understood that the appearances of the comic book characters in issue were fanciful and not utilitarian in any respect. *See* 689 F.2d at 1045. In *Brandir*, the court stated it would be appropriate to *examine* a broad product line, but nothing therein suggested that after

examination one could not conclude that widely different products did not fulfill the same functions, or fulfill them as well. *See* 834 F.2d at 1148. To the extent anything in *Brandir* suggests that a product feature is nonfunctional if there is *any* alternate design that competes to *any* degree, it is inconsistent with the purpose and extent of the functionality doctrine described above.

Accordingly, even viewing the evidence in the light most favorable to Leatherman, the only reasonable conclusion is that the overall appearance of the PST is not protectable as trade dress, at least as against a competitor which clearly marks its own product with a distinct name and who uses distinct packaging. Since there is no dispute that Cooper marked and packaged the Toolzall distinctively, judgment as a matter of law should have entered in its favor.[8]

### III.

The portion of the judgment that grants Leatherman a permanent injunction is REVERSED. No costs are allowed.

---

7. Indeed, Leatherman itself apparently sells a multifunction tool which is even smaller than the PST and which presumably has resulting advantages and disadvantages. That tool necessarily has a different appearance and it may demonstrate that alternative designs may be able to find a viable economic niche. Nevertheless, Leatherman does not have rights under trade dress law to compel its competitors to resort to alternative designs which have a different set of advantages and disadvantages. Such is the realm of patent law. For this

reason, trial testimony from Cooper's engineers and others that a tool with a different appearance could be just as *useful* as the PST does not support the verdict.

8. In view of this conclusion, we do not reach Cooper's argument that the district court erred in granting partial summary judgment to Leatherman regarding Cooper's argument that the overall appearance of the PST had been disclosed in certain patent applications.